America v. Keith Todd Ashley. Mr. Whalen, you may proceed. May it please the Court, Counsel, on behalf of Mr. Ashley, I first want to recognize the concessions made by the government. We agree with those concessions and are appreciative of those concessions. So I would like to move to Counts 9-16, which talks about the alleged scheme to defraud Midland National. And as we stated in our brief, we believe that the evidence is insufficient as it relates to all those counts in 9-16. As this Court stated in Green Law, a scheme to defraud has to include any type of false or fraudulent pretenses, representations intended to deceive others in order to attain something of value such as money from the entity to be deceived. And so when we go through the counts that they alleged, that are alleged wire fraud counts, we start with Count 19, and they put on evidence of a phone call. Now nowhere, anything about that phone call did anybody ever say that anything that Mr. Ashley said on the phone call was false. There was no misrepresentation in that phone call. Count 10 was the change of beneficiary form that was sent to Midland National. No one ever said anything about that count to say anything in that fax was false. Count 11 was an email which was sending in the change of the form, and it was signed by Mr. Segan. And there was no evidence in the record that Mr. Segan did not sign that, that anything in that change of beneficiary form was false. And then Count 12 dealt with a phone call Mr. Ashley made to check on whether or not the change of beneficiary had been made. And there's no false misrepresentations in that phone call. And then Count 13 dealt with Mr. Ashley calling in to notify Midland that Mr. Segan had passed away. But there's nothing, there's no misrepresentation in that phone call. But what if, what if all these are basically stop points along the way furthering, in furtherance of the illicit scheme? I mean, isn't that enough to submit the evidence that these can still rise to the level of mail fraud and wire fraud? I guess it's mail fraud for these counts. Well, these counts were wire fraud, and there's a couple mail fraud counts that, Counts 15 and 16 that I can talk about when we get to them. But my answer is no, because what they had to, to me, what they had to prove was that there was a scheme to defraud Midland National. Because throughout the way the indictment was pled, and the way they wrote it, and the way they presented the evidence, was the scheme was to defraud Midland National. And at no time did anybody from Midland National testify that because of the change in beneficiary, did they take an adverse action, or they wouldn't have paid the claim. They never said that. There, there is something in the record that, as it relates to whether or not they needed to know whether Mr. Ashley was the trustee of the trust, but they never came in and said, well, because of the change of beneficiary, we would have done something different, and because of that, we are out money. So there was no scheme to defraud or deceive Midland. Midland never said they were deceived. So it was, and so there was not a scheme to defraud Midland National. And they did not prove that. Because then when you look at the mail fraud count, they had the mail fraud count, which is count 15, which is the letter that changed, stating the change of beneficiary that went to Mr. Segan's house. And so there's nothing in the letter that's false. And then count 16 is the receipt of the autopsy report that Mr. Villarreal got, received in the mail. And that went to Mr. Ashley, but that was never presented to Midland National. Mr. Ashley never presented a claim to Midland National. He never made any representations to Midland National to file the claim for them to pay out the insurance policy to the trust. And I think that's important, because when you look at the timing of it, too, the death of Mr. Segan happened in February. I believe the testimony from Midland National says they paid the claim in April of that year. Well, he ran out of time to finish this scheme. But he also, but I think the other important part is he withdrew as trustee shortly after the death of Mr. Segan. I think within a week or two, he sent in and withdrew as trustee. So he was no longer the trustee. He never filed the claim with Midland National. So there was never a scheme, a completed scheme, even if you assume there was one, that he defrauded Midland National of anything or received any gain. And so when we look at the case law in Green Law and the different elements that we have to establish a scheme to defraud, a completed scheme to defraud, the elements aren't there. The government tends to rely on the Gray case out of the Fourth Circuit, and that case is distinguishable, because in that case, Ms. Gray committed the murder and was the beneficiary of those life insurance policies and actually filed the claim. We don't have those facts in this case. The claim was never filed by Mr. Ashley, and he never made any false misrepresentations to Midland National that resulted in any gain to him nor any loss to Midland National. So no false representations, but what about false pretenses? I mean, if the whole thing was a sham and he just didn't have time to finish it, isn't that, isn't all of these different documents here, there, mailing, calling, isn't that sufficient evidence to send to the jury? No, because I think there wasn't any false pretenses, because when you look at the testimony that you had, because it would— Clearly the jury found otherwise, and we owe deference to the jury verdict. Strong deference. We do. You do owe strong deference to that. That raises another question. I'm sorry, it's off topic, but do we have to accept the government's concession or the party's concessions? There's not enough evidence. I don't think we do, correct? That's a great question. I'm not sure you do. I think I didn't find anything that says you do or you don't. However, my only response to that would be, as it relates to the concessions that they did make, as it relates to the 924C count, they didn't fully brief the count as it related to the interstate commerce issues and things. So yes, I think you could potentially don't have to accept those concessions, but I think based on their briefing of it and their concessions that we would ask you to do that, because I think that would be—it would be appropriate because the evidence was insufficient to support those counts. But wouldn't our review be the same as any other sufficiency challenge? We would go and look at the record and see if there was, in fact, sufficient evidence that was submitted to the jury for them to convict? Yes, this Court has the ability to do that, but I think in light of the government's concessions conceding that the facts didn't support it, I think that should be given great weight, especially in the light of the fact the government brought the case. Where's your case law that says it should be given great weight? I haven't seen any. That's why it's a great question, Your Honor. I think it's up for the Court to decide whether or not to accept the concessions. But I think based on the evidence that was presented and the government's briefing and concessions to it, I think those convictions should be—an enhancement should be set aside, I think. Thank you. I didn't mean to get you off. I just wanted to ask that before we got farther along. No, I appreciate that, Your Honor. And I think the other thing, too, is I think part of the theory the government had in their briefing in a trial was that—getting back to your question, Your Honor—is about was that there was this false pretenses to create this. And so what you have to assume is that there was some undue influence or pressure to Mr. Segan to then change the—create a trust and change the beneficiary of the one-life insurance policy to the trust. In the testimony of his trust lawyer, Mr. Kacinza, that came in, he testified and who drafted both the wills and the trusts. In the record at page 1869, he said he created the wills and trusts according to Mr. Segan's wishes. And then on page 1879, he knew exactly what he wanted. It was kind of a slam dunk. And so there was no evidence presented that there was any type of undue influence on Mr. Segan to create the trust, change the beneficiary. How is it Mr. Ashley justified going to Mr. Segan's residence? I know this is allegations. Wasn't he taking—wasn't he ostensibly taking blood for the policy documentation and that sort of thing? That was the government's theory. Well, the government's theory, but, I mean, they also—the theory was supported by the fact that he didn't have blood taken. He had a substance injected that made him unconscious before he suddenly committed suicide is the allegation, I guess. I mean, in other words, Ashley went to his house under false pretenses, again, accepting the government's version of events. But I think—but then it comes—but it still comes back to the charge is the scheme to defraud Midland National. And so how does that—how does the death of Mr. Segan and maybe a potential scheme to defraud as the trust and have control of trust money, that doesn't lead to Midland National being a victim and defrauding Midland National. And that was their theory, is that the victim's Midland National. And Midland National never came in and said, we were a victim. Because of this, we would have never paid the claim. They in fact paid the claim. Well, but—and you sort of described it. By diverting the proceeds of the life insurance from whoever the beneficiary was before to the trust, and again, the theory goes, the trustee paying himself a large portion of the proceeds and diverting those from the trust beneficiaries would cause Midland to be in a situation where the rightful beneficiaries are then suing Midland and everybody else to try to get collected. And so, I mean, I can easily see how they'd be victimized, whether they said it that way or not. I mean, isn't that all foreseeable? To me, it's not foreseeable based on the facts, because Midland never was a victim of any type of— Well, it didn't happen. It didn't happen, right. It was the intention for it to happen, at least under the government's telling, and the jury credited it. Right. I understand that's what the government said, but— Isn't that enough? No, because it's not completed. Because there's no—because if you look at the different elements of wire fraud, there has to be gain to the person, there has to be a false misrepresentation, and Midland National has to be a victim. And I don't see— I don't understand how it would work, because it seems like if there were people coming in, different people, they would just interplete it into the registry or something, and then the court would determine who has the policy. I don't understand how the—if they would have come in and claimed—I don't—it seems like a bad theory to me. So maybe that's a friendly question, that I don't see how it would have been fulfilled in that way. And I don't either, Your Honor. I mean, I think when I looked at it, I still was—I've always been confused about how Midland National was a victim in the case, when he's only the trustee, he's not the beneficiary, and never was a beneficiary of any life insurance plan. But they wouldn't be directing, right? They would be deciding on their policy, and that's what they do this all the time. Right. And they have competing beneficiaries all the time, and there's all kinds of good procedures for that. Right. And also— That's their business, to make sure they pay to the right person, and that it's been documented. That's— And it is their business, and they testify that they paid it to the right person. I mean—and Plus, there was two policies here, too. There was one, there was a policy where Mr. Segan's wife was the direct beneficiary, and that was paid. And then you had the other policy that that was paid to the trust months after the death of Mr. Segan, and Mr. Ashley was no longer the trustee of the trust. Can you argue your sentencing point before your time runs out? Okay. Which one? Well, that we need to re-sentence for any of these variety of reasons. Yes. I do think, as far as re-sentencing, it does need to go back for re-sentencing at a minimum. We can talk about the insufficient counts, but it has to go back for re-sentencing at a minimum. If the court grants these concessions and goes with the government on their concessions, it has to go back for re-sentencing, because despite the government's argument that he should get 20 plus 20 and that sentence should stand, that wouldn't be a correct guideline calculation, because the way the sentencings, the guidelines for those underlying wire fraud counts came out was they were maxed out really originally at 360 months because of the life sentences, and so they would have to go back to be recalculated for correct guideline range for the court to consider. So I do think at a minimum it has to go back for re-sentencing for reconsideration of the guidelines. Let me ask you this. If we rule that there's a nexus between force and taking and it's satisfied, even though they were separated by two days, does this mean we have to find that 2113E is satisfied for sentencing purposes? On the bank theft? Yes. Oh, for the enhancement? I would assume if you found that? You can wait to rebuttal if you want. Let me think about that. But I do think the other issue, too, that as far as sentencing issue is the issue of the financial institution. I know that the government at trial conceded, at sentencing conceded that, say, well, the Fifth Circuit hasn't ruled on this financial institution, so we'll do a downward variance. I do think the issue is not necessarily moot because there's still a jury finding that still exists that if we're going to come back and re-sentencing, the question is, is that enhancement still in existence? Even though the government had sentenced a judge to a downward variance, that wouldn't necessarily prevent Judge Mazzan from doing something different. So I do think the court needs to rule, or unless the government concedes . . . Unless they're going to say, you get a re-sentencing and you can't do this enhancement. Unless we said that, then we have to rule on whether the enhancement is correct. That's correct, Your Honor. All right. Thank you, Your Honor. We've saved time for rebuttal. Is it going to be Mr. Vizkoski or Mr. Day? Because Mr. Day, who's listed second, has 15 minutes, and that seems odd because usually the second person would have the 5. Yes, Your Honor. It is irregular. I'm Bradley Vizkoski. May it please the Court. The reason for the division of time was for me, as a Chief of the Appellate Division, to address the government's concessions, and I think when we concede on the significant issues that are involved in this case, we owe an explanation. So I just wanted to talk about the concessions, and then Mr. Day would . . . Would argue the case, basically. You're going to talk about the concessions, though. Okay. Correct, and Mr. Day will handle the contested issues. And as far as the reason, it's really simply that it was a different evaluation of the law to the facts of this case. How in the world couldn't this have happened before you tried the guy? I'm sorry, Your Honor. How in the world couldn't this have happened before you tried the guy on all these counts? The brief says, upon reflection, the government's concessions. I mean, what in the world? Well, Your Honor, there is an indictment review that our office goes through. The branch chief that does those reviews was on the trial team, and their hearts were in the right place, and they did have a theory of why this satisfied 924C. And the most compelling one, I think, that's on the surface, at least, deals with the $20,000. I don't see the argument with respect to becoming the trustee because there was no taking of personal property. I don't see how that could possibly be a robbery. So the person who's supposed to review these indictments for consistency and appropriateness thought it was appropriate and was on the trial team, in fact? Yes, Your Honor. And the way— And there's some other person who reviews it after the fact? Well— How does it work in your office? That's what you're here to tell us. Yes, Your Honor. So indictments are reviewed by the branch chiefs of our office. When? I'm not entirely sure just because I'm not part of that process. I'm not sure. Before trial, though? Before trial, correct. Okay. And the way—and so when it gets to the appellate group, I looked at it. I didn't want to be the only one making this decision. I had several people in the appellate group and seasoned prosecutors.  Yes. To make concessions of this scale, we do have to go to Maine justice, Your Honor, and they approve the concessions that we made. And in the prosecutor's defense, the way—the best argument dealt with the $20,000 two days later. And it was—that was the taking of the personal property, the taking of the $20,000, by means of force that they couldn't have gotten it without murdering Mr. Segan. And it was from Mr. Segan's person, not his physical person, but basically like his legal personhood or estate. It was from his account. I'm—reflection. I mean, I disagree with that. We tried to keep the concessions as simple as possible in the brief, Your Honor. Well, while you're talking about that, the Hobbs Act requires that you obtain property from a person who are in his presence. Can you rob a corpse? No, I think that's a huge problem, Your Honor. And it's precisely why we conceded. In fact, there was a statement by the prosecutor in closing argument that at the time the $20,000 was taken, Mr. Segan was in—at the mortuary at the moment. And robbery—because the reason it has—robbery has enhanced punishment is the threat of force to, you know, your money or your life situation. And that certainly isn't what happened here as we view it, Your Honor. But, you know— How can you concede all of this? And there's—it's probably good that you conceded if you—because that's the role of the United States and any prosecutor to be for the people and not try to press things that are overzealous, although it would have been more appropriate to have made on the front end, and that's kind of the problem. How can you concede so much and then have Mr. Day get up here and put him in the—isn't that his name, Mr. Day? That's correct, Your Honor. Get up here and have to say, oh, well, it doesn't matter at all and we should continue to oppose these many, many life sentence—you know, that's a hard—that puts him in a—in an extremely difficult position. And he's not saying, no, it's not. He recognizes he's in an extremely difficult position. No, we all— So, why didn't you also concede that the sentencing needed to be do-over at the very least? Well, Judge Bazant considered all the facts, and I think as relevant conduct, he could consider the murder aspect. And as— Well, aren't—I mean, are you saying he can consider acquitted conduct? We can't do that anymore, can we? You know, it's not acquitted, but you're conceding it, and so it seems unfair for that to be considered. Well, it certainly— You know, unless it was part of something else. Right. It's certainly an issue that we talked about extensively in the moot about the sentencing, Your Honor. We do think that the sentence is that Judge Bazant imposed on the counts that remain are legitimate and appropriate given the scope of the conduct, but that, of course, will be something for the Court's consideration. Shouldn't he decide that, knowing— Judge Bazant. Yeah. Shouldn't he have a chance to look at it again in light of all this extremely change in what—that's a lot of counts. No, I understand, Your Honor, and especially with a life sentence. A life sentence, yeah. We do understand it. We're trying to do the best and the right thing. We realize it's not fair to the District Court, who accepted our request— But it's not only fair to the defendant. I mean, it's the guy's life and liberty we're talking about, and he had to go through the ordeal of a trial, and there's not even a, you know, a judgment of acquittal or anything like that at the end of the thing. I don't disagree, Your Honor, and honestly, this entire—it's a murder case, and the State of Texas has a murder case open. I don't know exactly why they didn't go first and deal with that and leave the wire fraud counts to us. I don't know. That's how I view the case. It's how several people have looked at it, have viewed the case, and, you know, all I can say is, you know, we apologize for it. We've tried to enliven the situation, do the best that we could, but— I just hope it wasn't anything related to somebody trying to make a name for themselves in a murder case. That would be a completely inappropriate reason to have kept it. I would totally agree, Your Honor. I do know these prosecutors. They're very good, very dedicated prosecutors, and I think they were doing their best to do justice for the victims. In my view, it was a miscalculation of the law, but I think that they were trying to do the right thing. But again, we do apologize for the situation that we're in. Thank you. I appreciate your candor with the Court. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. Sean Day on behalf of the United States. As Mr. Vazoski said, I'm here to discuss the live issues, for lack of a better phrase, that are remaining in this case. And I begin by addressing some of the arguments made by opposing counsel. The first, with respect to counts 9 through 16, is that none of the wires that were used, or the mails that were used for those counts, were false. They had no false statement in them. That is not a requirement of the wire utilized in a wire fraud or a mail fraud scheme. It's simply that the wire or the mail be essential to the scheme itself. That can be seen in counts 1 and 3 of this indictment as well. There is nothing false or fraudulent about a $150,000 wire transfer, but it still remains an essential part of a wire fraud scheme. So I would respectfully disagree with Mr. Whalen's description of that. How was Midland left without money that it otherwise would have possessed? Midland wouldn't have possessed the money anyway. It was just holding it for the correct person. Yes. Midland, as an insurance company, was holding the assets. But they aren't the assets. That is, those are the assets of Midland National that it was being called upon to dispose of at a time created by Mr. Ashley. Mr. Ashley chose by his actions to force Midland to pay out a policy it would not otherwise have had to pay. It would not have otherwise possessed it, though, because it would have just been paid out to the other beneficiaries had it been wrong. Well, a couple points. And you did raise this question with Mr. Whalen. Certainly, I don't think there is any requirement of wire fraud that the criminal have a smart scheme, that it be an intelligent scheme, that the criminal defendant appreciates what exactly will happen, simply that the criminal defendant is trying to obtain money fraudulently, not that they appreciate the ins and outs or the means by which other parties may jump in and try to take control of some of the assets of the policy. I still don't understand what Midland was deprived of, and I don't understand how he benefited. And so I think those are essential. Sure. And I'm happy to discuss those. First, with respect to what Midland was deprived of, Midland was in control. The money having been paid under the life insurance policy were the assets of Midland. Midland was called upon to pay those assets at a time in the form of a beneficiary payout to the trust at a time that it would not otherwise have had to do so, but for— Is that true with any death? It certainly is true with any death, absolutely. It's a life insurance policy. Eventually— Life insurance companies love to hold it for a long, long time. They want everybody to live a long time. That's right. That's right. If somebody doesn't play that game and they die early, they've got to pay out. Sure. Obviously, there are actuarial decisions that are made by life insurance companies when they— Surely you're not contending that Midland's actuarial tables were off because Mr. Segan was killed? No, I don't know that I'm arguing that, but I think what I am arguing is that it was not the expectation of Midland National that it would be paying out an insurance policy on Mr. Segan in early 2020. We've got a wire fraud claim now with regard to every murder of an insured. No, I don't know that that's the case. I think we would have— Why? Well, I think we'd have a wire—I think we'd have an insurance fraud, and I don't want to speak too broadly, but I certainly think there would be potential where the murderer, the defendant, was the trustee of a trust that would receive the proceeds of the beneficiary and control the disposition of the policy and was, as the facts show, was an agent and salesman of the initial insurance policy themselves. This was not an individual unrelated to the insurance policy. In this case, as you'll recall, Mr. Ashley sold the insurance policy to Mr. Segan on behalf of Midland National and also, of course, served as the trustee of the receiving trust that would receive those assets. So, yes, in those cases, I do think we would have a wire fraud scheme associated with any murder on the facts as it were presented in this case to this jury. Were you on the trial team? I was not, Your Honor. Well, I should say I was the author and I am the signatory of the motion response to the motion for judgment of acquittal. That was my first entrance into this case and my first reading of this case. I did not participate in the trial or the pre-trial discussions that Mr. Visosky made. With respect to, I think this goes both to your question, Judge Alrod, and to one of the points the opposing counsel made, distinguishing Gray. Mr. Whalen's distinction is that, well, in that case, the defendant was the beneficiary of the policy and in this case, Mr. Ashley was merely the trustee. I think that is, for this case, a distinction without a difference. As trustee, as we set out in our brief, the trustee had significant power to dispose of assets and to pay himself reasonable compensation. Mr. Ashley, a certified financial planner who, in his relationship with Mr. Segan, had already falsely induced him to invest money previously, certainly the jury was entitled to believe that any money that Mr. Segan, I'm sorry, Mr. Ashley received as part of that policy, he could use as sort of a slush fund with which he could invest, perhaps, in quotes, invest in future unit investment trusts. So I do think there was, I think the fact that he's not a beneficiary but a trustee is a distinction without a difference. If I could then turn to some of the other counts. Well, can I ask about, can wire transfer orders be representations for the purposes of 2113B, even though the Fifth Circuit says they're not representations under 1344? It seems like that's an inconsistency. I'd have to think about that, Your Honor. I'm sorry. I mean, that's a technical point, but we're supposed to be technical. Yes, we are, yes. And I don't question the validity of the question. I do, I'd have to think about that, and we'd certainly be willing to prepare some post-argument briefing on that, but I don't simply have an answer for you today on that. If they can't be representations, does that, that's a big problem, isn't it? It certainly would pose some questions, I think, Your Honor. On all those counts? That's a big problem in the case that has heretofore been not really discussed. Yes, that is true. It is not heretofore discussed, including by opposing counsel in raising these arguments. Ian, but we have to — you're asking us to uphold for other reasons. Yes, yes, we are. We have to consider other reasons when we're upholding them. Sure, yes. And, Ian, I'm happy to provide post-trial briefing on that, or post-argument briefing on that, but I don't have an answer for you. We'll let you know. Okay. Thank you. Thank you very much. If I could, I would like to turn to the bank theft count, count 19. Mr. Ashley argues that there was insufficient evidence to support the conviction for bank theft because, as he says, quote, at no time did Mr. Ashley step foot into a Texas capital branch or present anything to a teller or to any bank personnel. However, the first paragraph of section 2113B does not require Mr. Ashley to walk into a bank and to walk out with sacks of cash. The first paragraph only requires the defendant take and carry away money or property under the bank's custody or control. Such was what happened here. Mr. Ashley took and carried away money from Seegans Bank when he moved the money by a wire transfer to another bank. The United States introduced considerable evidence, insufficient evidence, that Mr. Ashley used an app without permission on Mr. Seegans' cell phone to conduct a wire transfer of $20,000 from Mr. Seegans' bank account to the KBKK account, an account established and under the control of Mr. Ashley. We do believe there was sufficient evidence with respect to that. With respect to count— Can I ask a question? Sure. Doesn't transferring money from a business to a personal account further a fraud when the purpose is personal gain? I'm sorry. I'm not following your question, Your Honor. All right. Doesn't transferring money from a business to a personal account further a fraud when the purpose is personal gain? Yes, I would agree with that, Your Honor. Yes. Okay. With respect to counts 1 and 3, and I would point out that although Mr. Ashley introduces the idea that he will challenge the sufficiency of the evidence with respect to count 3, he never follows through. There is no actual argument that there was insufficient evidence with respect to count 3, so I will limit my remarks to count 1. With respect to count 1, the United States introduced sufficient evidence to show that a scheme to defraud exists, the defendant used wires, and the defendant had the specific intent to defraud. That evidence included the email from Mr. Ashley to Mr. Segan of a proposal to invest $150,000 in a, quote, United Investment Trust, and that three days later, Mr. Segan does, in fact, wire $150,000 to Mr. Ashley. The United States also introduced evidence that this money was never invested in a UIT, but instead diverted to Mr. Ashley's benefit. This was sufficient evidence from which a jury could conclude that the elements of wire fraud had been met. Mr. Ashley seeks, in his briefs, to draw the Court's attention away from this evidence by pointing to a contemporaneous promissory note executed by Mr. Segan in favor of Mr. Ashley. It's unclear, however, to me what this intends to prove. The promissory note for which Mr. Ashley offered no evidence of payment on does not refute or disprove the existence of a scheme or intent to defraud. With respect to sentencing, if I may, as has been pointed out, the United States does expect that this case will need to be remanded with respect to count 19 due to the— I didn't see that. I believe, and we do in our briefs, yes, with respect to count 19. With the life sentence, you really don't think that it should just be remanded for resentencing given the many concessions and the whole change of— Your Honor, I— It's a big ask. And I appreciate that, Your Honor. I do understand what we are asking. I think it is—certainly, let me begin with the most simple of the arguments with respect to that, and that is with respect to count 20. Judge Mazant imposed a 20-year sentence for Mr. Ashley on count 20. At no point is there any argument made in any of the briefs with respect to the deficiency of evidence or as to count 20 in particular. So I think there would be no reason to resentence with respect to count 20. Which one's count 20? I'm sorry. Count 20 involves the wire fall in Mr. Villarreal. Okay. So on that one, there would be no reason to rescind or to resentence the full 20 on those. Yeah, but if the district court's revisiting sentencing with regard to a bunch of other counts, doesn't it make sense to send it all back and say you can reconsider everything? Your Honors, I certainly do. Don't we usually let the district court balance the factors and sort of see the whole picture as opposed to segmenting? Sure, and I appreciate— It is complicated, and I understand the allure and certainly in some ways the efficiency and arguments about simply just putting this all back in the hands of the district court. Well, particularly because a lot of the overcomplication is the fault of the government. Yes, it is. It is the United States' responsibility for some of that. I will say that the concessions that the United States has made relate to not insignificant but legal questions with respect to whether or not Mr. Ashley's conduct met the charges in the indictment. The United States' concessions do not in any way relate to the underlying facts. There is more than sufficient facts in this record to demonstrate that Mr. Ashley, under false pretenses, entered Mr. Segan's home and murdered Mr. Segan, and then two days later stole money from Mr. Segan's bank account. Those facts would have been heard by the jury and were heard by the jury and would be fairly considered by the district court in sentencing as they relate to the conduct. Judge Mazan, in his argument, made note of how all of this was related, how the fraud that was perpetrated was taken, took place in the context of moving from initial Ponzi scheme all the way through to murder and then post-murder bank theft. So all of these would have been entertained by the court and the court would have heard this evidence and would have utilized it to impose a sentence. Judge Mazan's sentencing colloquy puts strong emphasis on Mr. Ashley's conduct, and I think it would be unnecessary to go back and revisit with respect to those counts. And if I could, just in— I'm sorry. I have three more questions. Sure. Yes, Your Honor. Whatever time you'd like. Enhancement. How can we just say it's moot and move on if we are going to send it back? And I'm not foreshadowing, but assuming arguendo. I'm sorry, the enhancement with respect to financial institution? Yes. Yeah. Your Honor, I think, you know, I take on board and understand Mr. Whalen's idea that the jury did make a finding of affecting a financial institution. The United States, however, as he also pointed out, requested that Judge Mazan not utilize that enhancement and in any subsequent resentencing would again not—would request that that not be considered. So I don't believe there's any necessity of that. Okay. Misrepresentation to the bank. You know, the Cusick and the Howiter case found things were not misrepresentations to the bank. You know, that they had enough money in their credit union account to pay for the cashier's checks were not a misrepresentation. And the Howiter, there's no fraudulent conduct directed at the bank, only at the school, because they were misappropriating the school's funds, moving the funds from one to the other. It seems very analogous here, the school's funds case. So why isn't that—how can you have a misrepresentation that's appropriate here? I'm sorry, I'm not following the thrust of your question, Your Honor. The thrust of my question is the whole how is there a misrepresentation to Midland? Again, I think the misrepresentation to Midland is that Mr. Ashley is requesting these beneficiary changes, is informing the Midland National of the death of Mr. Segan, and of course there is— And so that's an underbank theft. I don't understand how that's a fraudulent conduct directed towards— Your Honor, I think it's all true enough, but what it leaves out of the narrative that he's telling to Midland National is first that I am altering the beneficiary to a trust I will control so that I can then carry out the murder of Mr. Segan and take control of that trust. He's not telling any of that to Midland. He's not telling—that's exactly right. He's not telling— It's theory. Well, I think he's not telling it to Midland. Of course, that would not be something you would generally tell anybody, but I think he's not telling it to Midland because that is the scheme that he is concealing from them. I am making these changes so that I can then murder Mr. Segan and take control of the trust. When I am calling you to inform you that Mr. Segan is dead, I'm not telling you that I am the killer. That furthers the scheme of, again, of taking assets that Midland would not otherwise have at that time been forced to pay and taking— Are you familiar with Howarter or not? I can't say that sitting, standing here, I can recite any of it, but— Fine. I don't want to quiz you about a case that you're not familiar with. And I appreciate that. But I think in that case, it has to do with misappropriating other people's funds and that that was not enough directed at the bank. And so it's analogous to the bank here. So that's my question. I'll have to take a look at that on my own. With regard to my third question, and my final question, has to do with Stinson and Kaiser and intended loss. Sure. You know, as this Court made clear that the commentary to the guidelines remains binding absent there being a — it's either plainly erroneous, the guideline, the commentary is plainly erroneous, or that commentary violates the Constitution. Nothing in Mr. Whelan's argument suggests that the commentary saying that the district court shall use the greater of actual or intended loss violates the Constitution or is plainly erroneous. So in that case, I think this Court's— Do you think Vargas controls this situation? I do, yes, Your Honor. Just in closing, and unless the Court has any other questions, I would sort of like to follow up with respect to Mr. Vizosky's point in that inscribed on the walls of the Department of Justice is a quotation from former Solicitor General William Lehman that the United States wins its point whenever justice is done to the citizens in its courts. It's a very serious decision the United States made with respect to concessions in this case, and we took that decision seriously and not lightly, and it was a difficult decision. We did it, however, because on reflection, we believed it was the right thing to do, and we appreciate the Court's entertaining our argument today. Thank you, Your Honor. Thank you. We have your argument. You've saved time for rebuttal. May it please the Court? Judge Weiner, I think your question was whether or not you thought the enhancement would still apply. I'm sorry? I think your question about Section E of 2113E is whether it would apply if there was a taking, I think, was your question. I don't think that that enhancement under the facts of this case applied in any . . . because assuming there was a bank theft, there was no . . . the plain reading of the statute the way we read it, there's not a lot of case law on it, but it seems to suggest that any type of injury or death is occurring post of the removal of the money from the bank. What about his other question, which is the hard question for you, about if it's transferred to personal funds? Right. So I think if it's transferred as it relates to . . . on the bank theft or the wire fraud counts? On the wire fraud. On the wire fraud. Okay. On the wire fraud counts. Well, as it relates to that, I think the way we briefed it, and if I recall correctly, was is it material . . . is it . . . I forget the wording about material to the scheme. And so him moving it from KBKK to a personal account, he controlled all the accounts. So the gain already occurred once it went to his business account. So it's . . . because he's the only one who owns the account. He's the only one who owns the company. Nothing happened at that point. No. Nothing happened at that point. So I don't think that that movement of money then would be in furtherance of the scheme to the fraud and be sufficient for those counts. Also, I would like to talk briefly about on the bank theft as it relates to venue. I do think that's a critical question as far as the sufficiency goes as it relates to venue. We raised that issue because I think the evidence showed that the money from the . . . that was moved from the bank account occurred at Mr. Segan's house, which is in the northern district of Texas. And then I believe it's Mr. Hilson, who is the IT director from Texas Capital Bank, walked the jury through how that transaction is done. And his testimony is once the Fed gives it an acknowledgement number, the transaction is completed. And so therefore, we believe that as it relates to sufficiency, that venue is an issue as it relates to the bank theft. Now, I also would like to go back and kind of talk about the remedy. What is the remedy in the case? And I do think the government said that our motion to sever was moot, but I don't think it is. I do think we had filed the motion to sever. The counts, at that point, we had the 924C count, then the bank theft with the enhancements. So all these allegations about a murder are now going to be part of this trial, and we filed our motion to sever. And the standard is whether the capacity of the jurors to file the court's instructions accordingly, keep separate the evidence that is relevant, and render a fair and impartial verdict. And so I think the evidence clearly establishes that the joining of those counts that are 9 through 20 in the indictment were prejudicial as it related to counts 1 through 6. Because if you look, in our view, there's prejudice, because the jury can victim of every single count and every enhancement. And now we're in a position where at first at sentencing, the government said, well, we're going to back off the financial institution issue. And then now here, they've conceded, rightfully so, the other issues in the case as it relates to the enhancements of the 924C. And so I do think, and the fact that they also, on the wire fraud counts, 2, 4, 5, and 6 are insufficient, that this murder that belongs in state court clearly affected the entire trial. And it was the argument of the government. And so I think as it relates to if counts 1 and 3 are sufficient, that they go back, he should get a new trial on counts 1 and 3. Because we asked for that severance, I think prejudice has been shown. Because the jury's verdict, and now coupled with the government's concession, show there was prejudice. And then as it relates to count 20, we did not brief count 20, we made a tactical decision about count 20, because we had so much room and so many issues going on in the case. But we could ask the court, if there's a manifest miscarriage of justice, to think about whether or not that should be a new trial as well. And we thank you for your time, Your Honor. Thank you, Mr. Whalen. We note that you were court appointed, and we appreciate your fine representation on behalf of your client. And we appreciate the fine arguments on both sides today. Thank you. This case is submitted.